**WOODS, Housing Expediter, v. POLINO.**

**Civ. A. No. 898.**

United States District Court
S. D. West Virginia, Charleston Division.
Aug. 30, 1949.

12. Cf. Grace Bros. v. Commissioner, 1949, 9 Cir., 173 F.2d 170.

Sanford S. Simms, Enforcement Attorney, Office of the Housing Expediter, Litigation Section, Cleveland Ohio, John J. Lane, Esq., Area Rent Attorney, Charleston, W. Va., for plaintiff.

Dayton, Campbell & Love, Charleston, W. Va. (Charles M. Love, Charleston, W. Va.), Herbert W. Bryan, St. Albans, W. Va., for defendant.

BEN MOORE, Chief Judge.

The Housing Expediter brings this action to recover alleged overcharges of rent in the amount of $550, and to obtain an injunction against the defendant, restraining violations of the Housing and Rent Act of 1947.

Defendant owns a seven room house located at 98 Second Avenue in St. Albans, West Virginia, which location is within the Charleston, West Virginia, Defense Rental Area. He purchased this property from Harry K. Wheaton and others on March 26, 1946. It was agreed in writing at the time of the purchase that possession should be delivered to defendant within ninety days, or, failing that, Wheaton would pay him liquidated damages at the rate of $75 per month until defendant got possession. Due to illness, Wheaton held over for approximately twenty days after the expiration of the ninety day period, but defendant waived the collection of any payment therefor as provided in the contract of purchase and sale.

After defendant took possession of the house he made extensive repairs, after which he rented it for a while, for commercial use, to a tenant who operated it as a home for alcoholics. This tenant was evicted on December 15, 1946. No further use was made of the house until, on January 28, 1947, an agreement was entered into between defendant and J. Q. Friend, whereby the house was leased to Friend for a period beginning on February 1, 1947, and extending for one year. The agreement provided among other things that the house should be used for commercial purposes only, and that any occupancy thereof as a residence by Friend would be incidental to its commercial use. The agreement contained an option to buy, and provided for a rental of $90 per month beginning February 1, 1947, with an advance payment of $600.

Friend moved with his wife into the house on February 15, 1947, and soon thereafter, for the purpose, as he testified, of saving money on his rent, he procured a license from the city of St. Albans to operate a tourist home, placed a sign in front of the house reading "Boulevard Guest House," and from then until April, 1948, accepted overnight guests. In all the period during which Friend accepted transient

guests, there were not more than approximately seventy-five nights when guests were afforded lodgings in the house. Ordinarily, only one bedroom was used to house transients, the other two bedrooms, together with all the downstairs living quarters, being occupied by Friend and his wife. However, on a few occasions when more than one couple applied for lodging, two rooms were made available, and on July 4, 1947, Friend himself being away from home at the time, his wife rented out all three bedrooms to transient guests, and slept on the sofa in the living room.

About April, 1948, Friend took down his sign and thereafter did not accept tourists as guests. Defendant learned that Friend had ceased to operate a tourist home, whereupon he served a notice of eviction upon him and thereafter refused to accept any payment of rent from him.

On September 16, 1948, the Rent Director for the Charleston Defense Rental Area entered an order whereby it was found that the premises owned by defendant and occupied by Friend were housing accommodations rented prior to July 1, 1947, and that the maximum rent on the date of the first renting was $75 per month; and the maximum rent was reduced to $40 a month, effective July 1, 1947.

This action is brought to collect alleged overcharges covering a period from July 1, 1947, to June 1, 1948.

In support of the proposition that defendant is liable for the alleged amount of overcharges, plaintiff contends, first and basically, that the holding over by the Wheatons for a time after the ninety days within which they were required to give possession or pay liquidated damages at the rate of $75 per month constituted a renting of the premises, and that this renting having occurred during the period beginning February 1, 1945, and ending January 31, 1947, it served to bring the premises within the definition of "controlled housing accommodations" as used in the Housing and Rent Act, and fixed the maximum rent at $75 per month, subject, of course, to the authority of the Rent Director to reduce or increase the maximum figure; secondly, that the premises were occupied by Friend

as a residence and not as a tourist home; and thirdly, that if the Court should conclude that the premises were operated as a tourist home, this conclusion would not free the underlying lease from control, since the statute decontrolling tourist homes or any part thereof affects the relationship of landlord and tenant as between the operator of the tourist home and his transient guests, but not as between the owner of the premises and his tenant, who operates them as a tourist home.

While this case was pending in this Court, it was brought to my attention that defendant had not secured a final ruling from the Housing Expediter with reference to his contention, urged before the Area Rent Director, that the property in question is not subject to rent control. Being of opinion that this was an available administrative remedy, I advised the parties that I would not consider defendant's defenses to the action until his administrative remedies had been exhausted. Thereupon, he proceeded to appeal the Area Rent Director's ruling administratively, and on March 17, 1948, the Housing Expediter entered an order denying him relief. This order contains no factual findings at variance with those which I have announced above. It does, however, set forth the legal conclusion that the house was rented during the period in 1946 when the Wheatons retained possession after the sale to defendant; the further conclusion in effect that the house was not operated as a tourist home within the meaning of the statute; and that, "on the basis of the record, it does not appear that the house has been decontrolled."

I am unable to agree with the conclusion of the Housing Expediter that the holding over by the Wheatons under the contract which provided that the seller should have ninety days from the date of sale to surrender possession of the property, and should pay liquidated damages at the rate of $75 per month for any further delay in delivering the premises, constituted a renting. Premises cannot be said to be rented unless the relationship of landlord and tenant exists between the owner and the occupier. In this case, there was

no such relationship. The purchaser merely gave the seller the right to defer delivery of the premises for a period of ninety days. When he held over beyond that time he became a trespasser, not a tenant. It is true that after the expiration of the ninety days the seller was to pay liquidated damages at a monthly rate for any further delay; and if there were circumstances tending to show that this arrangement was a mere device to conceal what was actually a landlord and tenant relationship, it might well be argued that such a relationship did in fact exist; but no such circumstances are shown. Only because of Wheaton's illness was he permitted to hold the premises beyond the ninety day period, and then, despite the provisions of the contract giving him the right to collect liquidated damages at the rate of $75 per month, defendant collected nothing from Wheaton.

No contention is made that the house was ever rented prior to the acquisition thereof by defendant.

■ The Housing and Rent Act of 1947, as amended, 50 U.S.C.A.Appendix, § 1881 et seq., contains the following provisions:

"Sec. 202(c). The term 'controlled housing accommodations' means housing accommodations in any defense-rental area, except that it does not include * * *

"(3) any housing accommodations * * (B) which at no time during the period February 1, 1945, to January 31, 1947, both dates inclusive, were rented (other than to members of the immediate family of the occupant) as housing accommodations."

Only such housing accommodations which are by the Act expressly brought under control of the Housing Expediter are subject to his orders in relation to maximum rents or otherwise. Any such accommodations which the statute expressly excludes from the definition of "controlled housing accommodations" may be freely rented by the owner for whatever rental may be agreed on between the owner and a tenant. Since the Act expressly excludes from control any housing accommodations which were not rented at any time during the period February 1, 1945, to January 31, 1947, and since defendant's premises were not so rented during said period, I think

it is plain that defendant's house was never subject to rent control under the 1947 Act.

It may be urged against this conclusion that the very lease which is in question here is dated January 28, 1947, which is three days before the expiration of the test period. The answer to that argument is that the effective date of the lease was February 1, 1947, and that Friend's actual occupancy under the lease did not begin until February 15, 1947. In these circumstances, it is my opinion that the premises were not rented prior to February 1, 1947, within the meaning of the statute.

From the conclusion which I have stated above, it necessarily results that plaintiff's action must be dismissed. However, in view of the possibility that my conclusion in this regard may, on appeal, be found to be erroneous, I think it proper to consider also the other points relied upon by plaintiff to sustain his action.

■ In my opinion, Friend did operate the premises as a tourist home from February, 1947, to April, 1948.

The Housing Expediter promulgated regulations (as I believe, within the scope of his authority under the statute) in which were contained definitions of "rooming house," and "tourist home" as follows:

"(12 F.R. 4302) Section 1. Definitions and Scope of This Regulation.

"'Rooming house' means, in addition to its customary usage, a building or portion of a building other than a hotel or motor court in which a furnished room or rooms not constituting an apartment are rented on a short term basis of daily, weekly or monthly occupancy to more than two paying tenants, not members of the landlord's immediate family. The term includes * * * tourist homes."

"'Tourist home' means a rooming house which caters primarily to transient guests and is known as a tourist home in the community."

Under the foregoing definition of a tourist home, a building in which only a single furnished room is rented to transient guests is a tourist home if there are more than two paying tenants, and it is known in the community as a tourist home. The house

occupied by Friend was evidently known in the community as a tourist home, by reason of the fact that he kept displayed in front of the house a sign bearing the words "Boulevard Guest House." Three bedrooms were available for transient guests, although usually no more guests presented themselves in any one night than could be suitably accommodated in one bedroom. In other words, ordinarily no more than two paying tenants were accommodated as transient guests; but whenever more than two asked for accommodations, those accommodations were supplied. It is my opinion that readiness to accept transient paying tenants, rather than the actual presence of such tenants in the room or rooms on each night of their availability, distinguishes the premises as a tourist home.

It is argued that the occupancy by Friend and his wife of the living quarters, and of one and sometimes two bedrooms, as their residence, takes the premises out of the tourist home category. I am not impressed by this argument. Tourist homes are established institutions in America, and it is well known that in such places the family customarily live in the house and devote only a part thereof to the purpose of entertaining transient guests. It is difficult to see how a tourist home could be operated on any other basis.

█ The question remains whether the provisions of the Housing and Rent Act of 1947 relating to tourist homes should be interpreted so as to apply to the underlying lease on the premises in which such tourist home is operated.

Section 202(c) (2) of the Act contains the following language: "The term 'controlled housing accommodations' means housing accommodations in any defense-rental area except that it does not include * * * any tourist home serving transient guests exclusively, or any part thereof."

The accommodations intended to be decontrolled are the accommodations provided in the tourist home; that is, the accommodations provided *for the use of tourists.* Those accommodations consist simply in the furnishing of rooms for sleeping quarters to transient guests; and it is such accommodations, that is, those accommodations in which the operator of the tourist home is the landlord and the transient guests are the tenants, which it is the intention of the statute to bring under control.

█ The broad purpose which patently underlies the Congressional policy of rent control is that, in a period of scarcity of living accommodations, tenants who use such accommodations as their homes shall not be subjected to the high rental rates which free competition produces. Consequently, maximum rates are set by government agencies rather than by free competition. However, Congress, in passing the Housing and Rent Act of 1947, saw fit to restore to the competitive field certain forms of housing, and among them was that which is afforded tourists in tourist homes and motor courts. Travel is essentially a luxury. In freeing from control the rates charged tourists for overnight accommodations, Congress did not deviate from its policy of continuing to protect the ordinary householder from exorbitant rents. Tourist homes are often operated by their owners, and of course in such cases no question can arise as to the interpretation of the decontrol statute; but if the owner rents to another, who, in turn, becomes the operator of the tourist home and who, in connection with his operation thereof as a tourist home, lives in the premises with his family, it would be inconsistent with the recognized policy of the Housing and Rent Act to exclude such a family occupancy from the operation of rent control. Considerations of Congressional policy must, of course, yield to the plain provisions of a statute; but on the other hand, if the language of the statute is ambiguous, it should be interpreted, if possible, so as to give effect to the known Congressional policy. This I believe can be done only by limiting the exclusion of the statute to the relationship between the operator of the tourist home and the transient guests whom he serves. It is therefore my opinion that the underlying lease upon premises used by the lessee as a tourist home in which the lessee and his family live is subject to

rent control under the Housing and Rent Act of 1947.

If it were held that the premises in question were rented within the meaning of the Act, at a time during the test period between February 1, 1945, and January 31, 1947, my opinion would be that the premises are subject to rent control, and that plaintiff is entitled to recover the amount of the overcharges; but since I have concluded, as above set out, that the premises were not so rented during the test period, the case must be decided in favor of defendant, and plaintiff's action will therefore be dismissed.

An order may be presented for entry in accordance with this opinion.