## Spector et al. v. Rosenblum et al.

*Sanford S. Marateck*, for plaintiffs.
*Myron M. Moskowitz*, for defendants.

TROUTMAN, J., January 17, 1955.—This action of assumpsit was instituted by plaintiffs against defendants to recover the sum of $810, with interest from November 15, 1952, for rent alleged to be due them

by defendants under a written lease. An answer was filed by defendants containing "New Matter" and also a counterclaim in which defendants seek to recover the sum of $3,035.02 on account of expenditures made by them because of plaintiffs' alleged failure to comply with the terms of the written lease. Plaintiffs filed a reply to the "New Matter" and an answer to the counterclaim and the case was then at issue.

By stipulation and agreement filed of record, plaintiffs and defendants dispensed with trial by jury and submitted the decision of the case to this court.

Hearings were held before the court, without a jury, on the pleadings hereinbefore enumerated, and witnesses were called by both parties and their testimony taken.

Each of the parties requested the court to state separately and distinctly the facts found and the conclusions of law and that the decision of the court be filed in accordance with the provisions of the Act of April 22, 1874, P. L. 109, as amended, 12 PS §689.

### Findings of Fact

1. Plaintiffs are devisees of the residuary estate of Isaac Bernstein, who died on August 28, 1948, a resident of the City of Shamokin, Northumberland County, Pa.

2. Defendants are husband and wife and reside in the City of Shamokin, Northumberland County, Pa.

3. On July 6, 1946, Jacob and Mary Bernstein, husband and wife, entered into an agreement of lease with defendants, Joseph and Gertrude L. Rosenblum, husband and wife, whereby there was leased to defendants the first-floor apartment situated in a dwelling house located at 101 East Arch Street, City of Shamokin, Northumberland County, Pa.

4. By deed dated April 1, 1948, Jacob and Mary Bernstein, parties of the first part in the lease, granted

and conveyed the premises to Isaac Bernstein by fee simple deed.

5. On April 1, 1948, Jacob and Mary Bernstein assigned the lease to Isaac Bernstein by a written assignment duly executed and delivered.

6. Isaac Bernstein died August 28, 1948, and under the terms of his last will and testament, the premises located at 101 East Arch Street, Shamokin, Northumberland County, Pa., and his interest in the lease, vested and descended to plaintiffs.

7. Under the terms of the lease, the premises were rented, demised and leased to defendants for the term of one year commencing on August 15, 1946, and ending on August 14, 1947, and defendants agreed to pay for the use of the premises the sum of $1,020 payable in 12 monthly installments of $85 each payable in advance on the fifteenth day of each month during the term of the lease or any extension or renewal thereof.

8. The term of the lease was for one year with an automatic renewal for subsequent years, if the parties of the first part did not give to defendants 30 days' notice to quit prior to the end of the then current term.

9. The lease in question was effective and operative for a period of one year from August 15, 1952.

10. Defendants were in possession of the premises from on or about August 15, 1946, until September 2, 1953, when the premises were vacated by the defendants.

11. On June 23, 1953, plaintiffs served a notice to vacate the premises on defendants by United States registered mail.

12. Beginning July 15, 1946, and until September 30, 1952, the City of Shamokin was under Federal rent control.

13. On October 24, 1946, an order was issued by the Rent Director of the Office of Price Administra-

tion, United States of America, changing the rental of the leased premises from $85 per month to $40 per month, plus the care of the furnace by the tenant to become effective the first day of the following rental period.

14. On September 30, 1952, all rent controls in the City of Shamokin expired.

15. By letter dated October 29, 1952, and received by defendant, Gertrude Rosenblum, on October 30, 1952, plaintiff by their counsel notified defendants that because of the expiration of rent controls in the City of Shamokin on September 30, 1952, the rent of the premises occupied by them would be $85 per month in accordance with the terms of the lease, said increased rental to become payable the month of October.

16. From October 1952 until the end of the term in August 1953, defendants paid the sum of $40 to plaintiffs on account of rent, although during that period defendants on several occasions tendered checks in the sum of $40 for a month's rent for the premises, which were refused by plaintiffs.

17. Under the terms of the lease plaintiffs agreed to furnish water to the premises, to remove all ashes and garbage and to heat the demised premises to 70 degrees Fahrenheit during cool weather at their own cost and expense, except that defendants were to keep the automatic stoker hopper filled with coal.

18. Defendants attempted to notify plaintiffs, at times when the stoker was in need of repairs, by calling the business place of George Bernstein.

19. On many occasions, the stoker was in need of immediate repairs and defendants had the repairs made and paid for the same.

20. The stoker repairs made by defendants were necessary in order to keep the premises heated at 70 degrees Fahrenheit during cool weather.

21. During the periods from August 1952 to June 14, 1953, defendants purchased coal which was delivered to the premises occupied by defendants.

22. During the period from March 17, 1952, to February 18, 1953, plaintiffs purchased and delivered 14 tons of coal to the premises occupied by defendants.

23. On numerous occasions when coal was delivered the bin was practically empty.

24. Defendants notified plaintiffs of the need for coal by contacting the business place of George Bernstein, one of the plaintiffs, and also by contacting plaintiff, Florence Rosenzweig.

25. There is no evidence to indicate the amount of coal necessary to be consumed upon the premises to furnish heat at 70 degrees Fahrenheit during cool weather.

26. There is no evidence to indicate that the defendants were not able to heat the premises at 70 degrees Fahrenheit with the coal supplied by plaintiffs.

## Discussion

The lease upon which plaintiffs seek to recover rent alleged to be due by defendants was executed on July 6, 1946, at which time there was no Federal rent control in force and effect, The Emergency Price Control Act of 1942, 50 U. S. C. App. §901, expired on June 30, 1946. The Price Control Extension Act of 1946, 60 Stat. at L. 664, 50 U. S. C. App. §901(a), became law on July 25, 1946, and under section 18 of that act, it was provided that the rent regulations for housing shall remain in effect without interruption as if the Extension Act had been enacted on June 30, 1946, at which time the former act had expired. The premises covered by the lease in this case had never before been under Federal rent control and at the time the lease was executed, there had been no maximum ceiling placed upon the rental for the premises. Following

the Extension Act of 1946 and on October 24, 1946, which was after the time when the lease agreement went into effect, the order of the Rent Director was issued reducing the rent to $40 per month plus care of the furnace by tenant, effective the first day of the following rental period.

The controlling purpose of the Emergency Price Control Act of 1942, as extended by the Act of July 25, 1946, and subsequent acts, was to protect the public during the war emergency, notwithstanding private rights and interests were necessarily affected: Bowles v. Farmers' National Bank of Lebanon, Ky., 147 F. 2d 425. In Cobleigh v. Woods, 172 F. 2d 167, the court held that the provision in the Price Control Extension Act of 1946, section 18, 50 U. S. C. App. §901(a), which became law on July 25, 1946, under which rent regulations for housing remained in effect without interruption, as if the Extension Act had been enacted on June 30, 1946, the date when the former Price Control Act expired, was constitutional though it might involve prospective modification of existing agreements, valid when made between landlords and tenants during the interregnum period. Consequently, when the original lessors and defendants entered into the lease of the premises on July 6, 1946, a valid and binding agreement was made between the parties for the lease of the premises at $85 per month for a period of a year, commencing August 15, 1946, with the privilege of renewals, and the reduction in the rental made by the Rent Director on October 24, 1946, was a change made by operation of law and not by any mutual agreement of the parties.

All Federal rent controls expired in the City of Shamokin, where the premises are situated, on September 30, 1952, and at that time, all Federal power over rental contracts ceased. On October 30, 1952, defendants received notice from plaintiffs that for the

duration of the term of the lease the rental would be the sum of $85 per month as was provided in the original lease.

It is the contention of defendants that since the lease had renewed itself for a period of one year beginning August 15, 1952, which was prior to the expiration of rent controls, defendants are only bound to pay the sum of $40 per month rent, which was fixed by the Rent Director, for the balance of the term. Plaintiffs contend that with the expiration of rent controls, the rent as provided under the lease originally entered into by lessor and defendants went into effect.

The facts clearly indicate that at the time the lease was executed the parties had a perfect right to provide for a rental mutually agreeable to them. Federal price controls were not then in effect and no rent ceiling had ever been previously fixed for the premises in question, they having been occupied by the landlords at the time the lease was executed.

We are of the opinion that the lease agreement was not abrogated or invalidated by reason of the Rent Director reducing the maximum rent to $40 per month on October 24, 1946. Such action was the exercise of powers granted under the Emergency Price Control Act. According to the order of the Rent Director, the new rental was to take effect the first day of the following rental period. The order of the Rent Director, in effect, approved the collection of the sum of $85 per month from the time the lease became effective until his order took effect. When the power to control rents expired, the original lease became effective and plaintiffs had the legal right to insist that the rent should be $85 per month, in accordance with the terms of the lease. There is no attempt on the part of defendants to declare this lease invalid but, as a matter of fact, it is their contention that the lease of the premises was effective and operative for a period of one year from

August 15, 1952. Defendants are relying on the terms of the written lease as far as their tenancy is concerned but resist the payment of the amount of rent set forth in the lease. It is inconceivable that a landlord would be bound by a rent ceiling fixed by the Rent Director for the entire term of a lease which was entered into prior to placing the premises under rent control. Had the lease in question provided for renewal periods of, for example, five years, following defendants' argument to its ultimate conclusion, a landlord would have to be content with receiving a greatly reduced rent long after the Rent Control Act became ineffective.

After rent controls had been lifted, plaintiffs had a legal right to insist upon defendants paying the rent reserved in the lease. However, we are of the opinion that defendants were not obliged to pay the increased rent until they received notice from plaintiffs that they would insist upon the rental named in the lease. Since no notice was given to defendants until October 30, 1952, we are of the opinion that the rent for October should have remained at $40 per month and that the rent for the subsequent months of the term of the lease should be $85 per month. We conclude, from the testimony, that no rent was paid for the month of October, although there was a payment of $40 made by defendants in January 1953, which was admitted by plaintiffs. Applying this payment on the rent due for October, there would remain unpaid rent for a period of nine months at $85 per month, or the sum of $765, in which amount defendants are indebted to plaintiffs.

The cases cited by defendants in support of their position (Tatewosian v. McLellan et al., 78 R. I. 207, 80 A. 2d 879; Dunlap v. Navarro, 326 Mass. 700, 96 N. E. 2d 397; Woods v. Polino, 86 F. Supp. 650; Licznerski v. United States, 180 F. 2d 862) are not analogous on their facts to the present case. Those

cases involved violations of the order of the Area Rent Director and involved attempts on the part of landlords to collect overcharges of rent. Furthermore, rent controls were in effect when the matters giving rise to the causes of action occurred.

In their counterclaim defendants allege that plaintiffs breached the covenant in the lease which provides that the lessors shall heat the demised premises to 70 degrees Fahrenheit during cool weather at their own cost and expense, except that the second parties should keep the automatic stoker hopper filled with coal, and as a result thereof, defendants were obliged to buy coal and expend money for repairs to the stoker in order that heat might be obtained.

It is well settled that a landlord has no duty to repair demised premises unless such obligation is assumed in the lease and, in the absence of such agreement, there is no duty upon him to do so: Adler v. Sklaroff, 154 Pa. Superior Ct. 444, 446. In the lease in question, there is no covenant by which the landlord assumed any obligation to repair the demised premises. We are of the opinion, however, that it was the obligation of the landlords to furnish heat to the premises to at least 70 degrees Fahrenheit during cool weather and in order to do so, it was necessary for them to have sufficient coal on hand, and their furnace and stoker in such operating order as would furnish 70 degrees heat. If the plaintiffs failed to repair the stoker and failed to provide such quantities of coal as would furnish the minimum amount of heat, then a breach of their covenant to provide such heat occurred and defendants are entitled to be reimbursed for their expense in keeping the stoker in repair and supplying the necessary coal.

Defendant, Joseph Rosenblum, testified that at various times between 1947 and 1953, while he was a tenant, he was obliged to have repairs made to the

automatic stoker in order to place it in operating condition. He testified that he attempted to contact George Bernstein, one of the plaintiffs, at his factory and left messages with a girl in the office concerning necessary repairs. He further testified that on one occasion he called Jacob Bernstein in Maryland in reference to repairs to the stoker and was informed that the repair work was done by the Holland Furnace Company. Jacob Bernstein testified that he had informed Mr. Rosenblum of the names of the various people he should contact in case of necessary repairs. According to the testimony of Oren Erdley, who is employed as an installing mechanic for the Holland Furnace Company, he made at least 20 visits to the premises for the purpose of repairing the stoker during the defendants' tenancy. Many times the stoker would break down during the nighttime and it was necessary to have the repairs made promptly, particularly during the winter months. This witness further testified that his company had no record pertaining to this work, although records had been kept, but when managers were changed, the previous records were removed.

Defendant, Joseph Rosenblum, testified that on various dates he called the Holland Furnace Company to make the repairs and paid the amounts which they charged for their services. He also purchased various items from the Krebs Electric Company, such as rods for shear pins, which he installed himself. The total amount paid by defendants was $165.47. While defendants perhaps could have made an additional effort to contact respective plaintiffs as to the needed repairs, there is nothing in the testimony to disbelieve that defendant did not pay for the various repairs made to the stoker. The record indicates that the stoker was not in a very good condition and was subject to frequent breakdowns. Since it was necessary to operate the stoker in order to furnish the heat to the tenant,

we are of the opinion that plaintiffs are indebted to the defendants in the sum of $165.47 on account of these repairs.

A different question arises in respect to defendants' claim for the amounts expended by them in the purchase of coal. Defendant, Joseph Rosenblum, testified that he made frequent calls to George Bernstein, one of the plaintiffs, at his factory and on one occasion did call Mr. Bernstein at his home when there was need of coal. He testified that he was obliged to purchase coal from Peter Reichwein and several other parties in order to maintain heat. Mr. Reichwein, who was called as a witness for plaintiffs, testified that he did deliver some coal to defendants and was paid for the same by them. He likewise testified that on various occasions during the year 1952 and during 1953, he delivered coal to the premises on order of plaintiffs. The record shows that 14 tons of coal had been delivered between March 17, 1952, and February 18, 1953, and paid for by plaintiffs. Defendants offered testimony showing that approximately 13 tons of coal, some of which was in bags, were purchased by them between August 1952 and June 14, 1953. The witness, Reichwein, testified that on many occasions the coal bin was practically empty. A comparison of dates when coal was purchased by plaintiffs and coal was purchased by defendants indicates that on October 21, 1952, defendants purchased one ton of coal and two days later plaintiffs purchased and had delivered four tons of coal, and on December 19, 1952, plaintiffs had delivered one ton of coal and on December 29, 1952, defendants purchased one ton of coal. There is no testimony to indicate the amount of coal required to heat the premises at 70 degrees during cool weather, even though plaintiffs' agreement in the lease was to the effect that they would furnish heat to that temperature. The burden was upon defendants to establish

that there was insufficient coal to heat the premises to a temperature of 70 degrees, since that was the extent of plaintiffs' obligation under the lease. While defendants offer testimony that at times there was no coal in the bin, they made no attempt to prove that there was insufficient coal to heat the premises to a temperature of 70 degrees. It is possible that defendants had been heating the premises to a temperature of 75 or 80 degrees and, therefore, were consuming more coal than it was necessary for plaintiffs to supply. Under this state of the record, we conclude that defendants have not proved their claims for expenses incurred in the purchase of coal, and their claim in this respect must be disallowed.

### Conclusions of Law

1. The written lease between plaintiffs and defendants for the premises at 101 East Arch Street, Shamokin, Northumberland County, Pa., was in effect from August 15, 1952, to August 15, 1953.

2. After the termination of rent controls in the City of Shamokin on September 30, 1952, the rent of $40 per month, as fixed by the Rent Director, ceased to be effective, and the rent as stated in the signed lease of $85 per month became due and payable, upon notice to defendants by plaintiffs.

3. Defendants were properly notified and demand was properly made for payment of rent in the sum of $85 per month as provided in the written lease on October 30, 1952.

4. The rental for the premises leased to defendants for the period of one month, beginning October 1952, was $40 per month, which amount, although tendered by defendants, was not accepted by plaintiffs.

5. From the month of November 1952 until the expiration of the term of the lease, the rental for the premises was $85 per month.

6. On or about January 1953 defendants paid and plaintiffs accepted the sum of $40, for which amount defendants are entitled to credit on account of their rent.

7. There is due and owing plaintiffs by defendants the sum of $40 for the rental of the premises for the month of October 1952, and the sum of $765 for a period of nine months beginning in November 1952 to August 1953, at a rental of $85 per month.

8. Allowing credit in the sum of $40 paid by defendants to plaintiffs, defendants owe to plaintiffs on account of rent of the premises the sum of $765.

9. Defendants having been obliged to cause the automatic stoker to be repaired during the term of the lease because of the failure of plaintiffs on all occasions to do so, plaintiffs are indebted to defendants for moneys expended by them for the repair of the automatic stoker in the sum of $165.47.

10. Under the evidence in this case, plaintiffs are not indebted to defendants on account of coal purchased by defendants during their tenancy.

11. Allowing defendants credit in the sum of $165.47 for moneys expended by them in the repairs of the automatic stoker, defendants are indebted to plaintiffs in the sum of $599.53.

12. Under all of the evidence in this case, a verdict must be rendered in favor of plaintiffs and against defendants in the sum of $599.53.

### Requests for Findings of Fact

The other issues of fact and law presented in this action are disposed of in the answers to plaintiffs' requests for findings of fact and conclusions of law and defendants' requests for findings of fact and conclusions of law, which are ordered filed herewith.

### Order

And now, to wit, January 17, 1955, it is ordered, adjudged and decreed nisi that plaintiffs, Mary Spec-

tor, Jacob Bernstein, George Bernstein, Samuel Bernstein, Murray Bernstein, Florence Rosenzweig and Rose Kaplan, are entitled to recover the sum of $599.53 of defendants, Joseph Rosenblum and Gertrude L. Rosenblum.

The prothonotary is directed to enter this order nisi and give notice to the parties, or their counsel of record, of the entry thereof, sec. reg. If no exceptions are filed hereto within 30 days after service of such notice of the prothonotary, the prothonotary of this court shall enter judgment in favor of plaintiffs and against defendants in the sum of $599.53.